## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## BALTIMORE DIVISION

| | |
|---|---|
| **TRACIE PARKER DOBBINS,** *et al.* | |
| Plaintiffs, | Civil Action No.: 1:17-cv-00540-SAG |
| v. | |
| **BANK OF AMERICA, N.A.** | |
| Defendant. | |

## BANK OF AMERICA'S OPPOSITION
## <u>TO MOTION FOR CLASS CERTIFICATION</u>

# TABLE OF CONTENTS

**Page**

FACTUAL AND PROCEDURAL BACKGROUND ................................................................ 3

    A.    The *Fangman* Litigation and BANA's dismissal in 2015 ................................. 3

    B.    The CFPB Enforcement Actions against Genuine Title and other lenders .......... 4

    C.    Plaintiffs file *Dobbins* in 2017 ............................................................ 4

    D.    Dismissal on Statute of Limitations grounds and the Fourth Circuit's ruling ...................................................................................................... 6

    E.    Dobbins' purchase and refinance loans on the Suitland Property ......................... 7

    F.    Bank of America's mortgage origination systems ................................................. 9

    G.    Genuine Title's inaccurate and unreliable loan data ........................................... 11

    H.    Selection of Settlement Agent ............................................................................ 12

I.    PLAINTIFFS HAVE FAILED TO SATISFY RULE 23'S EVIDENTIARY REQUIREMENTS FOR CLASS CERTIFICATION. .................................................. 12

    A.    Exhibits 1 through 4: Plaintiffs cannot use the Glickstein and Zukerberg depositions taken in other proceedings. ............................................................. 15

    B.    Exhibit 5: Zukerberg's *Fangman* Affidavit lacks foundation and does not show BANA was engaged in the Genuine Title scheme. .................................... 16

    C.    Exhibits 6 through 11: Plaintiffs rely on unauthenticated emails that does not establish any wrongdoing by BANA employees. ............................................ 16

    D.    Plaintiffs' unauthenticated Exhibit 14 is improper. ............................................ 17

    E.    Plaintiffs lack knowledge sufficient to prove their own claim. .......................... 18

II.    PLAINTIFFS INDIVIDUALLY LACK ARTICLE III STANDING, AND THEREFORE CANNOT REPRESENT A CLASS. .................................................... 19

    A.    Dobbins and Parker lack Article III standing. .................................................... 19

        1.    Alleged deprivation of "impartial and fair competition" does not confer Article III standing sufficient for a RESPA claim. ...................... 20

        2.    Plaintiffs have produced no evidence that they were overcharged and cannot show a "concrete, quantifiable" injury in fact. ..................... 22

    B.    If Plaintiffs cannot show Article III standing, no class can be certified. ............. 25

III.    PLAINTIFFS FAIL TO SATISFY THE REQUIREMENTS OF RULE 23(**A**). ............ 26

    A.    Plaintiffs have failed to show common questions subject to common proof. .................................................................................................................. 26

        1.    There is no "common evidence" that would prove the RESPA claim of the entire defined class. ............................................................. 27

# TABLE OF CONTENTS
### (continued)

**Page**

2.      Plaintiffs misconstrue RESPA and cannot prove RESPA claims for the entire class through a "pattern and practice" theory. .......................... 30

     a.      12 C.F.R. § 1024.14(e) does not support Plaintiffs' argument. ............................................................................... 31

     b.      Plaintiffs misconstrue *Freeman v. Quicken Loans*. ..................... 32

     c.      The *Fangman* and *Palombaro* classes were certified based on their different facts. ............................................................. 33

B.      Plaintiffs have not demonstrated adequacy or typicality. ..................... 34

IV.      NO CLASS CAN BE CERTIFIED UNDER RULE 23(B) BECAUSE INDIVIDUAL ISSUES AND DEFENSES WILL PREDOMINATE. .......................... 36

A.      Determining whether any particular class member has Article III standing would require individualized inquiries. ............................................... 36

B.      Individual inquiries regarding each class member's claim and BANA's defenses to each claim will predominate. ............................................. 38

C.      Equitable tolling presents individualized questions. ............................ 42

V.      THIS PROPOSED CLASS ACTION CANNOT BE SUPERIOR. ................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)....................................................................................................14, 36

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)...............................................................................................................13

*Baehr v. Creig Northrop Team, P.C.*,
   953 F.3d 244 (4th Cir. 2020) ...................................................................................... *passim*

*Blick v. Shapiro & Brown, LLP*,
   2018 WL 1547124 (W.D. Va. Mar. 29, 2018).......................................................................13

*Boulware v. Crossland Mortg. Corp.*,
   291 F.3d 261 (4th Cir. 2002) .................................................................................................27

*Branch v. Gov't Emps. Ins. Co.*,
   323 F.R.D. 539 (E.D. Va. 2018) ............................................................................................13

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
   155 F.3d 331 (4th Cir. 1998) ...........................................................................................35, 44

*Carrier Corp. v. Outokumpu Oyj*,
   673 F.33d 430 (6th Cir. 2012) ...............................................................................................43

*CFPB v. Genuine Title LLC*,
   No. 1:15-cv-01235 RDB (D. Md.)............................................................................................4

*CFPB v. Wells Fargo Bank, N.A.*,
   No. 1:15-cv-00179 RDB (D. Md.)............................................................................................4

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)...............................................................................................2, 13, 14, 36

*Cooke v. Manufactured Homes, Inc.*,
   998 F.2d 1256 (4th Cir. 1993) ...............................................................................................44

*Cordoba v. DIRECTV, LLC*,
   942 F.3d 1259 (11th Cir. 2019) .............................................................................................38

*Deiter v. Microsoft Corp.*,
   436 F.3d 461 (4th Cir. 2006) .................................................................................................35

*Ealy v. Pinkerton Gov't Servs.*,
514 F. App'x 299 (4th Cir. 2013) ........................................................35

*East Tex. Motor Freight Sys., Inc. v. Rodriguez*,
431 U.S. 395 (1977)........................................................................34

*Edmonson v. Eagle Nat'l Bank*,
922 F.3d 535 (4th Cir. 2019) ................................................... *passim*

*Egerer v. Woodland Realty*,
556 F.3d 415 (6th Cir. 2009) ..............................................................27

*EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014) ................................................... *passim*

*Fangman v Genuine Title LLC*,
2016 WL 6600509 (D. Md. Nov. 8, 2016) .....................................32, 34

*Freeman v. Quicken Loans*,
566 U.S. 624 (2012)....................................................................32, 33

*Galiano v. Fidelity Nat'l Title Ins. Co.*,
684 F.3d 309 (2012)..............................................................27, 29, 40

*Gariety v. Grant Thornton, LLP*,
368 F.3d 356 (4th Cir. 2004) ..............................................................14

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982)........................................................................30

*Grant v. Shapiro & Burson, LLP*,
871 F. Supp. 2d 462 (D. Md. 2012)......................................................42

*Halvorson v. Auto Owners Ins. Co.*,
718 F.3d 773 (8th Cir. 2013) ..............................................................37

*Krakauer v. Dish Network, LLC*,
925 F.3d 643 (4th Cir. 2019) ..............................................................26

*Lienhart v. Dryvit Sys., Inc.*,
255 F.3d 138 (4th Cir. 2001) .......................................................26, 38

*Lorraine v. Markel Am. Ins. Co.*,
241 F.R.D. 534 (D. Md. 2007)............................................................18

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)........................................................................22

*Messner v. Northshore Univ. HealthSys.*,
　　669 F.3d 802 (7th Cir. 2012) ............................................................38

*Minter v. Wells Fargo Bank, N.A.*,
　　2013 WL 1795564 (D. Md. Apr. 26, 2013) ........................................44

*Monroe v. City of Charlottesville*,
　　579 F.3d 380 (4th Cir. 2009) ......................................................13, 15

*Murdoch v. Rosenberg & Assocs., LLC*,
　　2013 WL 1209144 (D. Md. Mar. 22, 2013)........................................16

*Palombaro v. Emery Federal Credit Union*,
　　2017 WL 3437559 (S.D. Ohio Aug. 10, 2017)...................................34

*Schlesinger v. Reservists Comm. to Stop the War*,
　　418 U.S. 208 (1974)...........................................................................34

*Schuetz v. Banc One Mort. Corp.*,
　　292 F.3d 1004 (9th Cir. 2002) ...........................................................31

*Soutter v. Equifax Info. Servs. LLC*,
　　299 F.R.D. 126 (E.D. Va. 2014) ........................................................14

*Spears v. First Am. eAppraiseIT*,
　　2014 WL 4647679 (N.D. Cal. Sept. 16, 2014) ..................................31

*Spokeo Inc. v. Robinson*,
　　136 S. Ct. 1540 (2016)..................................................................19, 25

*Thole v. U.S. Bank, N.A.*,
　　2020 WL 2814294 (U.S. June 1, 2020) .............................................19

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
　　445 F.3d 311 (4th Cir. 2006) .............................................................13

*Unger v. Amedisys, Inc.*,
　　401 F.3d 316 (5th Cir. 2005) .............................................................14

*Wal-Mart Stores, Inc. v. Dukes*,
　　564 U.S. 338 (2011)...................................................................... *passim*

*Walls v. Sierra Pacific Mortgage Co.*,
　　2020 WL 1528626 (D. Md. March 31, 2020).................................23, 37

*Wittman v. Personhuballah*,
　　136 S. Ct. 1732 (2016).......................................................................25

**Statutes**

12 U.S.C. § 2607(a) ...................................................................................................31

12 U.S.C. § 2607(d)(1) .............................................................................................23

**Regulations**

12 C.F.R. § 1024.14(e)......................................................................................30, 31, 32

12 C.F.R. § 1024.14(f) ...............................................................................................40

**Rules**

Fed. R. Civ. P. 12(b)(1)..........................................................................................26, 45

Fed. R. Civ. P. 23 ............................................................................................ *passim*

Fed. R. Civ. P. 23(a)......................................................................................14, 26, 30

Fed. R. Civ. P. 23(a)(2)..............................................................................................26

Fed. R. Civ. P. 23(a)(3)....................................................................................19, 34, 35

Fed. R. Civ. P. 23(a)(4)....................................................................................19, 34

Fed. R. Civ. P. 23(b) ......................................................................................14, 36

Fed. R. Civ. P. 23(b)(3)....................................................................................26, 38, 45

Fed. R. Civ. P. 30(b)(6).................................................................................2, 15

Fed. R. Civ. P. 32(a) ...................................................................................... *passim*

Fed. R. Evid. 401 ......................................................................................16, 17

Fed. R. Evid. 403 ......................................................................................16, 17

Fed. R. Evid. 602 ......................................................................................16, 17

Fed. R. Evid. 802 ......................................................................................16, 17

Fed. R. Evid. 901 ...................................................................................16, 17, 18

Defendant Bank of America, N.A. ("BANA") opposes the Motion for Class Certification by Plaintiffs Tracie Parker Dobbins and Gladys Parker ("Plaintiffs"). ECF 50. First, the court should deny certification because Plaintiffs have failed to come forward with sufficient evidence to permit the Court to engage in the "rigorous analysis" required by Rule 23. Second, the Court should deny certification because Plaintiffs lack standing, and there is no way to determine on a classwide basis whether individual class members have sustained an "injury" sufficient to confer Article III standing. Third, Plaintiffs cannot show that they can satisfy the elements of Rule 23, including predominance.

## INTRODUCTION

This action is one of a series of class actions, filed by the same counsel, arising from Genuine Title LLC's efforts to use cash kickbacks and other means to expand its share of the settlement services business in markets nationwide. Litigation challenging Genuine Title's practices began in 2013, prompting enforcement actions by the Consumer Financial Protection Bureau and Maryland regulators who targeted Genuine Title, its principals, and various lenders that were actively engaged in those business practices with Genuine Title. Notably, BANA was never the subject of any enforcement activity during or after these in-depth investigations.

The initial *Fangman* class action initiated by Plaintiffs' counsel was filed against Genuine Title and the same lenders who were respondents in the enforcement actions. More actions followed. But this action improperly recycles those same allegations and accusations against BANA when no evidence supports them. In fact, BANA's evidence disproves them.

Genuine Title used different tactics to target different mortgage lenders, branch managers, and individuals, depending on the lender's size and structure. While Plaintiffs' class certification arguments go on at length about the elaborate Genuine Title "scheme"—with its sham marketing agreements, sham entities, and cash kickbacks—Plaintiffs do not even attempt

1

to show that this entire scheme was deployed *against BANA*. Instead, Plaintiffs' argument is that other lenders' conduct should somehow create a presumption that BANA engaged in the same conduct. But this presumption is both unsupported by the facts and incompatible with Rule 23.

The mix of inadmissible material and mere allegations Plaintiffs have submitted fails to carry their burden to come forward with "evidentiary proof" satisfying the requirements of Rule 23. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *EQT Prod. Co. v. Adair,* 764 F.3d 347, 357 (4th Cir. 2014). Plaintiffs' class certification motion depends on four pages of deposition transcript from another case, inadmissible here under Rule 32(a). Former Genuine Title principal Brandon Glickstein asserted there that *a single* BANA loan officer—not a branch manager—referred borrowers to Genuine Title because it provided him with "leads" at some unspecified point. But Glickstein could recall *no other* loan officer at BANA who accepted benefits and referred borrowers to Genuine Title—hardly the "common scheme" Plaintiffs seek to paint with their broad rhetorical brush. On the flimsy basis of Glickstein's testimony, Plaintiffs now overreach, seeking certification of a class of over 620 borrowers who closed loans over a six-year period with 52 different Mortgage Loan Officers ("MLOs") in 15 states.

BANA forecast the basis for its opposition to class certification in its Answer and Affirmative Defenses. ECF 39. But Plaintiffs failed to develop any probative evidence during the six-month period the Court set aside for class certification discovery. They took no depositions, not even a Rule 30(b)(6) deposition. And when Plaintiffs Dobbins and Parker were deposed and asked about their claims, their counsel interposed objections based on attorney-client privilege, implicitly conceding that Plaintiffs had no personal knowledge of anything that BANA had done wrong. Plaintiffs did testify that they were satisfied with the settlement services that they received in connection with their loan closing. Plaintiffs' written discovery responses further

demonstrate that they have no evidence that they, or any other putative class member, were overcharged for the settlement services they received.

Lacking admissible evidence, Plaintiffs now ask the Court to certify a class based on speculation and the presumption that because classes have been certified in other Genuine Title cases—involving other facts not present here, sham companies, sham marketing agreements, and cash kickbacks—one must be certified here. But speculation and presumption do not satisfy Rule 23. And the Court cannot conduct the "rigorous analysis" the Rule requires when there is no evidence to analyze. Plaintiffs' class certification motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

Multiple investigations, enforcement actions and class actions have been prompted by Genuine Title's conduct since 2013. But Genuine Title is not a party here, and its conduct targeting other lenders creates no presumption against the defendant in this action. If anything, the various other cases pursued by Plaintiffs' counsel show that Genuine Title's conduct and practices varied widely depending on which lender and branch managers it targeted.

### A.    The *Fangman* Litigation and BANA's dismissal in 2015

Genuine Title's scheme to win market share for its title and real estate settlement services has been public since late 2013. *See Fangman v. Genuine Title LLC*, Case No. 1:14-cv-00081 RDB (D. Md.). Plaintiffs' counsel subsequently had a state court receiver appointed for Genuine Title and obtained its server and some electronic records. Pls.' Mot. Ex. 12, ECF 50-13. That was nearly six years ago. Since then, using Genuine Title's records, Plaintiffs' counsel have solicited borrowers to bring class actions against multiple lenders.

In January 2015, counsel for the Fangmans and a new set of named plaintiffs filed a First Amended Complaint. This FAC brought class claims against lenders large and small, including BANA. *Fangman* ECF 47, at ¶¶ 4-43. A Second Amended Complaint followed in May 2015. It

alleged generally that various mortgage lenders inappropriately referred business to Genuine

Title in exchange for cash kickbacks and other improper benefits. *Fangman* ECF 92-1, at ¶ 62.

BANA moved to dismiss, arguing that (1) RESPA's statute of limitations had expired and

was not tolled, and (2) the loan officer the *Fangman* SAC accused of taking cash kickbacks was

working for Wells Fargo, not BANA, at that time. Acknowledging their claim was baseless,

Plaintiffs' counsel dismissed BANA on October 1, 2015. *Fangman* ECF 189, 191. *Fangman*

continued against the remaining defendants and as a severed case, *Palombaro v. Emery Federal

Credit Union*, Case No. 1:15-cv-00792 SJD (S.D. Ohio).

**B.     The CFPB Enforcement Actions against Genuine Title and other lenders**

Meanwhile, the CFPB and the Maryland Attorney General began an enforcement action

in this Court on January 22, 2015, against Wells Fargo Bank, N.A. and JPMorgan Chase Bank,

N.A. *See CFPB v. Wells Fargo Bank, N.A.*, No. 1:15-cv-00179 RDB (D. Md.). The CFPB and

Attorney General filed a second enforcement action against Genuine Title and its principals on

April 29, 2015. *See CFPB v. Genuine Title LLC*, No. 1:15-cv-01235 RDB (D. Md.). BANA's

prior submissions in this action—notably its Motion to Dismiss briefing (ECF 17-1 at 3-6 and

exhibits ECF 17-3 to 17-6)—detail widespread coverage of Genuine Title's misconduct in

newspapers including *The Baltimore Sun* and *The Washington Post* and news outlets like CNN.

BANA itself was never the subject of *any* inquiry related to Genuine Title by the CFPB

or Maryland regulators. And BANA was never a party to the CFPB or *Palombaro* actions, so it

had no opportunity to participate in discovery taken there or in *Fangman* (including the

depositions of Genuine Title's principals, Jay Zukerberg and Brandon Glickstein).

**C.     Plaintiffs file *Dobbins* in 2017**

Over two years after BANA had been sued in *Fangman* (and later dismissed), this action

was filed in February 2017 by the same counsel who filed *Fangman* and the other Genuine Title-

related class actions. An Amended Complaint was filed in July 2017. *Dobbins* ECF 1, 9. The Amended Complaint contains generalized allegations—repeated in the class certification motion—about how Genuine Title engaged in misconduct with *other lenders* using schemes such as sham marketing agreements. Although counsel control Genuine Title's records and deposed its principals in prior cases, the Amended Complaint contains only a handful of disconnected allegations about BANA employees. Otherwise, it simply reiterates the same highly generalized allegations about Genuine Title and other, unnamed lenders that were pled in *Fangman* against *all* of the lender defendants there. The Amended Complaint contains no allegations that BANA executed sham Title Service Agreements or of any other misconduct by BANA itself.[1]

Instead, Dobbins and Parker claim only that the individual MLO who closed *their* loan, Michael Bendebba, received marketing data (in the form of lead lists and unspecified "Turn Down Opportunities") from Genuine Title for referrals of settlement services. But they do not allege a timeframe. The Amended Complaint does not allege that Bendebba received any "Referring Cash" kickbacks. It also fails to allege—and Plaintiffs have provided no evidence— that the "lead" for the Dobbins/Parker loan came to Bendebba from Genuine Title, or that Bendebba received anything of value linked to the Dobbins/Parker loan. And BANA's records indicate that Dobbins had already communicated directly with BANA about a modification of her existing BANA loan many months before she contacted Bendebba.

The Bendebba allegations rest entirely on four transcript pages from a September 2016 deposition of Brandon Glickstein in *Palombaro*. Glickstein, formerly of Genuine Title, said he

---

[1] Genuine Title used sham entities and agreements to camouflage its misconduct with other mortgage lenders, *Fangman* ECF No. 211, Mem. Op, at 5 n.8. But there is no evidence of any sham entity or sham marketing agreement tied to BANA. The Amended Complaint (ECF 9, ¶¶ 24–34) makes general allegations about one sham entity, Competitive Advantage Marketing, but fails to link any sham entity to BANA.

provided "leads" to Bendebba. Pls.' Mem. Ex. 3, ECF 50-4, Glickstein *Palombaro* Dep. 97:12–100:3. Glickstein specified no timeframe except the "entire time Bendebba was referring" borrowers. His testimony was provided in response to a series of leading and compound questions from Plaintiffs' counsel during the 2016 deposition. BANA was not a party, was not provided notice of the deposition, was not given an opportunity to attend, and had no one present to represent its interests. Thus the deposition is inadmissible here under Rule 32(a).

Moreover, BANA's records show that during his time as an MLO, Bendebba received leads from multiple sources *within* BANA and that its refinance-eligible borrowers were being marketed through multiple channels.[2] Declaration of Nathan Mays ¶¶ 17–19 attached as Exhibit 2. This disproves Plaintiffs' assumption that all Bendebba-originated loans were somehow linked to Genuine Title leads. *See also* Declaration of Jay Zukerberg ¶ 12, attached as Exhibit 3.

And although Plaintiffs' complaint and motion for class certification make conclusory allegations regarding four Genuine Title "KickBack Schemes," no evidence exists that BANA itself participated in any of those schemes or made any agreement with Genuine Title.

### D.    Dismissal on Statute of Limitations grounds and the Fourth Circuit's ruling

BANA moved to dismiss the Amended Complaint, arguing in part that Plaintiffs' claim was barred by RESPA's one-year limitations period. ECF 17. Judge Bennett rejected Plaintiffs' contentions of fraudulent concealment, and held that their claims were time-barred. ECF 21-26.

The Fourth Circuit reversed. It concluded that Judge Bennett had not applied the correct fraudulent concealment analysis, which requires the plaintiff to "provide evidence of affirmative acts of concealment" by the defendant and that the plaintiff had "exercised due diligence." *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 553–54 (4th Cir. 2019). It then observed that

---

[2] Bendebba worked in the BANA branch in White Plains, Maryland.  Declaration of Catherine Strum ¶ 28, attached as Exhibit 1.

fraudulent concealment and due diligence are generally questions of fact "not amenable to resolution on the pleadings or at summary judgment." *Id.* at 554.

After remand, this Court entered its Scheduling Order on July 16, 2019. It set aside a six-month period dedicated to class certification discovery. ECF 37. Plaintiffs took no depositions. BANA deposed both Plaintiffs. Class certification discovery ended January 31, 2020.

### E.   Dobbins' purchase and refinance loans on the Suitland Property

Plaintiff Dobbins originally purchased the subject property ("Property") in 2004 with a loan from HSBC Bank. Tracie Parker Dobbins Deposition attached as Exhibit 7, 14:2–13. Plaintiff Dobbins testified at her deposition that she did not select or otherwise shop for a title or settlement services provider for her HSBC-originated loan. *Id.* 15:7–14. According to Dobbins, the title company made a titling error that increased her monthly loan payment by $300. Dobbins Sept. 7, 2007 letter attached as Exhibit 11; Dobbins Dep. 22:21–23:11.

In 2007, Dobbins and her mother Gladys Parker, who was also then living at the Property, obtained a refinance loan from Countrywide Bank FSB to consolidate Dobbins' first mortgage, a home equity line of credit, and existing credit card debt. 2007 Deed of Trust attached as Exhibit 10; Dobbins Dep. 14:2–16:10, 21:19–22:18. Even after the title issues with her 2004 transaction, Dobbins did not select the title insurer or settlement services provider for her 2007 refinance. She chose to have Countrywide select her settlement services provider. Dobbins Dep. 28:5–15. [3]

BANA records show that Dobbins called in to BANA's customer service lines regarding a loan modification on July 1 2010. Mays Decl. ¶ 23. Later in July 2010, Dobbins attended an event sponsored by the non-profit Neighborhood Assistance Corporation of America ("NACA")

---

[3] On July 1, 2008, BANA completed its acquisition of Countrywide. This meant that BANA acquired Dobbins' existing Countrywide loan on the Property. Strum Decl. ¶ 25.

because she was interested in loan conslidation. *Id.* 42:22–25. She testified that she did not

complete an application with NACA. *Id.* 40:20–23; Pls.' Ans. to Interr. 5 attached as Exhibit 9.

However, BANA's records reflect that it received her NACA application and status updates as

her application was reviewed (and therefore was on notice that she was looking to make a change

to her mortgage). The NACA loan modification process ultimately was abandoned because

Dobbins did not qualify. *See* BANA-Dobbins-000322 to BANA-Dobbins-000330 attached as

Exhibit 12; Strum Decl. ¶ 30.

Dobbins testified that she then received a flyer-style mailing from a nearby BANA

branch regarding lower interest rates and a potential refinance of her BANA/Countrywide

mortgage. She said she called the telephone number on the mailer. Dobbins Dep. 30:8–35:22;

Pls.' Ans. to Interrs. 5, 6. But Dobbins' written interrogatory responses and deposition testimony

are inconsistent. In her interrogatory responses, she swore that after receiving the mailer she

"contacted Bank of America and was directed to Mike Bendebba." When deposed, she testified

instead that the mailing *itself* identified Bendebba and that she called him specifically. Dobbins

Dep. 31:10–18. Dobbins did not retain the mailing and could not recall anything else about it. *Id.*

35:20–22; Pls.' Ans. To Interrs. 5, 6.

Dobbins and her counsel—despite having access to Genuine Title's records for nearly six

years—cannot show that she was ever identified as a "lead" by Genuine Title. Dobbins cannot

say whether her information was supplied to Bendebba by Genuine Title. Nor is Dobbins in a

position to deny that she received the solicitation based on BANA's own independent marketing.

She was an existing BANA FHA mortgage customer, and she had inquired about a modification

both through NACA and BANA directly. Instead, Dobbins speculates, without any foundation,

that it "seems likely" that she was part of a Genuine Title "lead" list. Pls.' Ans. to Interr. 6.

Dobbins sought to refinance her existing BANA loan with Bendebba as the originating loan officer in late 2010. Like all BANA borrowers, she was provided the option of choosing her own title services provider, or having BANA locate one for her. This option was offered through BANA's Notice to Applicant Regarding Title Insurance and Closing Agent ("NTART") form, which borrowers completed during the loan origination process. *See* NTART attached as Exhibit 13; Dobbins Dep. 61:25–63:3 (confirming the NTART form's contents); *id.* 64:13–21 (confirming her election). She never considered selecting a settlement services provider herself. *Id.* 63:4–10. Dobbins did not research Genuine Title or inquire about charges for title or settlement services. Nor did she compare the fees for title and settlement services listed on her Good Faith Estimate with her HUD-1 before closing. She did not compare those closing fees with the equivalent fees on her previous mortgages. *Id.* 65:3–68:4.

Dobbins and Parker both testified that they were satisfied with their settlement services, and that Genuine Title had provided services that entitled it to compensation. *Id.* 84:2–13; Deposition of Gladys Parker, attached as Exhibit 8, 19:13–24. Dobbins herself has no basis to claim that there was any overcharge for Genuine Title's services. Dobbins Dep. 81:4–25.[4]

## F.     Bank of America's mortgage origination systems

As a national bank with millions of mortgage borrowers, BANA had an "Enterprise Marketing" department continuously engaged in direct marketing campaigns to its existing customers. It reviewed the accounts in its customer base, ran searches and queries of the data, and sent marketing communications tailored to its customers' individual situations. Mays Decl.

---

[4] Although Dobbins' mother Gladys Parker was a co-borrower, she was not involved in the selection of the lender or loan officer, the application, negotiation of mortgage terms, or any other aspect of the loan. Parker Dep. 12:14–21, 13:15–14:3 (no recall of details of refinance); 14:4–6, 15:5–24 (no recall of co-signing loan); 18:14–19:4 (uninvolved in selecting lender or settlement/closing agent); 19:5–12 (could not recall being present at closing). Parker testified that she did not even know who Michael Bendebba was. *Id.* 20:22–24.

¶¶ 4-5. For example, borrowers with government-backed FHA and VA loans (like Dobbins) were routinely sent information about their potential eligibility for a streamlined refinance with relaxed underwriting standards and easier approval. *Id.* ¶ 6. These mailings generally contained an offer-specific toll-free number or other contact information for the customer to call to find out more information regarding the offer terms and eligibility. *Id.* ¶ 7.

BANA had two different categories of MLO systems: Retail and Centralized Sales. Mays Decl. ¶¶ 8-9. The Centralized Sales group worked in BANA offices and generally handled incoming inquiries from consumers about their mortgage needs, including inbound calls in response to Enterprise Marketing solicitations. *Id.* ¶ 8. The Retail Sales group generally worked in brick and mortar branches. *Id.* ¶ 9. Most Retail MLOs generated their own business and assisted mortgage borrowers at their own branches. However, higher-performing Retail MLOs were provided leads generated by Enterprise Marketing from BANA's customer base through the Customer Connection Program ("CCP"). *Id.* ¶ 10. For example, some loans originated by Michael Bendebba and closed through Genuine Title resulted from CCP solicitations Enterprise Marketing sent in Bendebba's name. *Id.* ¶ 19. And at least 121 loans listed on Plaintiffs' Exhibit 14 were borrowers who put themselves on a reservation list to be contacted regarding the federal HARP program. *Id.* ¶ 26. Because of the high volume of borrowers to be contacted, names on the HARP reservation list were routed to Retail MLOs, including those in the CCP program. And if the Centralized Sales MLOs were busy or the inbound call volume was high, the inbound calls would be directed to Retail MLOs instead, in a type of overflow system. *Id.* ¶ 24.

BANA does not have accessible records for *every* solicitation it sent to a consumer, but it does specifically document when a particular solicitation sent by Enterprise Marketing directly resulted in a new mortgage or the refinance of a prior mortgage. This link would be captured in its records when the customer called a specific telephone number tied to an offer and ultimately

10

closed a mortgage loan, or if an MLO flagged a loan as tied to a specific solicitation or promotion the customer had received. *Id.* ¶ 13. This link was documented as to at least 154 of the 572 loans on Plaintiff's Exhibit 14.  *Id.* ¶ 16. Many customers like Dobbins called or visited a branch to ask about refinancing in response to a solicitation from BANA rather than calling the telephone number on the solicitation or mentioning the solicitation specifically. *Id.* ¶ 13. Indeed, all but 8 of the 572 loans were refinances. Of those, 514 were "On Us" refinances, meaning that the borrower was *already* a BANA mortgage customer. Strum Decl. ¶ 19.

### G.    Genuine Title's inaccurate and unreliable loan data

During the six-month class discovery period, Plaintiffs never sought BANA's own records and data regarding loans it originated. Instead, Plaintiffs' counsel relied on the unauthenticated data they got through Genuine Title's receiver and their own manipulation of that data in Excel. Plaintiffs' counsel initially identified 920 loans from Genuine Title's data that they asserted were originated by BANA and for which Genuine Title provided settlement services. When BANA checked its data to determine which of these 920 loans were *actually* BANA loans, it found that Genuine Title's data was unreliable, and included closing dates and data for hundreds of entries for loans that were duplicates, were canceled, were invalid, never resulted in a mortgage, were handled by an outside vendor for Merrill Lynch (PHH Mortgage Corporation), or were ultimately closed with another title services provider. Strum Decl. ¶¶ 5-15.

Ultimately, BANA identified 572 loans—roughly 63% of Plaintiffs' original 920 loans—that actually fit Plaintiffs' criteria. Plaintiffs continue to assert that there are 620 "confirmed and unconfirmed" loans in their purported class, but that number includes at least 44 "loans" that do not exist in BANA's data. *Id.* ¶ 16. Thus, only 572 loans meet those two basic criteria, not the 620 Exhibit 14 loans, which include purportedly "*unconfirmed*" loans. Pls.' Mem. 12-13.

Further analysis of the 572 BANA mortgage loans on Exhibit 14 for which Genuine Title provided settlement services during the alleged "class period" disclosed that they were originated by 52 different MLOs in 15 different states. Strum Decl. ¶ 17. Thirty-nine of those MLOs only closed one loan each. *Id.* ¶ 18. Bendebba only originated loans between October 2010 and September 2011, when he left BANA. *Id.* ¶¶ 27, 28. BANA confirmed that at least 11 of Bendebba's loans resulted from specific BANA marketing campaigns sent to the borrowers by the Enterprise Marketing group, not by Bendebba. Mays Decl. ¶ 18. And 154 of the 572 loans came from Enterprise Marketing, while 18 were originated by MLOs in Centralized Sales rather than in retail branches. *Id.* ¶¶ 16, 27. None of these loans resulted from Genuine Title "leads."

## H.    Selection of Settlement Agent

In BANA's mortgage loan process, beginning by early 2010, each applicant completed an NTART form. Strum Decl. ¶ 20. Using this form, each applicant indicated whether she wanted to choose the attorney, title agent, and title insurer for her loan closing, or if she wanted the Bank to choose those providers. *Id.* ¶¶ 21-22. The NTART form would have prompted discussion about settlement services between each applicant and her MLO or loan processor. Here, Dobbins checked the NTART box indicating she preferred BANA to select providers for her. Dobbins Dep. 61:25–63:10. But other applicants checked the NTART box indicating they wanted to select their own provider, and wrote "Genuine Title" on the NTART form. Strum Decl. ¶ 23.

## I.    PLAINTIFFS HAVE FAILED TO SATISFY RULE 23'S EVIDENTIARY REQUIREMENTS FOR CLASS CERTIFICATION.

Evidence is essential if any class is to be certified under Rule 23.  This is because

[Rule 23] "does not set forth a mere pleading standard." Rather, a party must not only "be prepared to *prove* that there are *in fact* sufficiently numerous parties, common questions of law or fact," typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a). The party must also satisfy through *evidentiary proof* at least one of the provisions of Rule 23(b).

*Comcast Corp.*, 569 U.S. at 33 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)) (emphasis added); *see also EQT*, 764 F.3d at 357. "[I]t is the plaintiff's burden to demonstrate compliance with Rule 23, but the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." *EQT*, 764 F.3d at 358 at 358 (quoting *Wal-Mart*, 564 U.S. at 351).

The Court "should consider merits questions to the extent 'that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *Id.* at 358 (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)); *Wal-Mart*, 564 U.S. at 351 (the "rigorous analysis" of Rule 23's requirements will necessarily overlap with the merits of the claim because "[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.") (citation omitted). This includes a review of the substantive elements of Plaintiffs' case and BANA's defenses to envision the form a trial would take. *See, e.g.*, *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318 (4th Cir. 2006); *Branch v. Gov't Emps. Ins. Co.*, 323 F.R.D. 539, 544–45 (E.D. Va. 2018).[5]

Here, however, Plaintiffs have failed to provide the Court with sufficient admissible evidence to support class certification. Instead, they seek to rely on (1) unsworn allegations from their complaint; (2) selected excerpts from depositions taken in cases where BANA was not a party that cannot be used here under Rule 32(a); (3) unauthenticated emails that are irrelevant to BANA and inadmissible; and (4) an unauthenticated spreadsheet that is counsel's work product.

---

[5] By the same token, the district court must consider rebuttal evidence offered by the defendant. *See Monroe v. City of Charlottesville*, 579 F.3d 380, 383–84 (4th Cir. 2009). But Plaintiffs cannot cure their failure to submit evidence to support their class certification motion by offering it for the first time on reply. *Id.* at 384 (affirming refusal to consider untimely affidavit); *Blick v. Shapiro & Brown, LLP*, 2018 WL 1547124, at *2 n.3 (W.D. Va. Mar. 29, 2018) (declining to consider new evidence in reply brief).

But this is not the "evidentiary proof" that *Comcast* and *EQT* require and cannot satisfy Rule 23. Indeed, "[i]f it were appropriate for a court simply to accept the allegations of a complaint at face value in making class action findings, every complaint asserting the requirements of Rule 23(a) and (b) would automatically lead to a certification order. . . ." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)). This means that Plaintiffs must comply with the Rules of Evidence and Civil Procedure in order to support class certification. They may not rely on submissions that are inadmissible under those Rules or solely upon unsworn allegations in the Amended Complaint, which Plaintiffs Tracy Parker Dobbins and Parker cannot themselves verify.

Instead, Plaintiffs proffer allegations about Genuine Title's misconduct with *other* lenders in *other* cases. Plaintiffs then invite the Court to adopt their speculation about what Genuine Title might have done, and to presume that Genuine Title's misconduct injured BANA's borrowers in a way that would support a RESPA claim. But Plaintiffs' failure to come forward with sufficient admissible evidence regarding *BANA*—despite access to Genuine Title's records and six months to conduct pre-certification discovery—means the Court cannot meet its "independent obligation" to conduct a "rigorous analysis" under Rule 23 and *EQT*. That failure forecloses class certification.

Plaintiffs must present reliable *evidence*, not mere allegations, that a putative class exists under Rule 23. *See EQT*, 764 F.3d at 357. "The demand for a rigorous analysis of the class qualifying factors at the critical class certification stage makes it important that the evidence to be used in making that decision be reliable." *Souter v. Equifax Info. Servs. LLC*, 299 F.R.D. 126, 131 (E.D. Va. 2014); *see Unger v. Amedisys, Inc.*, 401 F.3d 316, 319 (5th Cir. 2005).

Plaintiffs had ample opportunity to develop evidence during the six-month period for class certification discovery that followed the filing of BANA's Answer on July 31 and ended

14

January 31. ECF 37. Yet Plaintiffs conducted virtually no discovery. They took *no* depositions.

They did not seek to depose BANA under Rule 30(b)(6) or to depose any present or former bank

employees. They did not depose Bendebba, the former MLO who originated the Dobbins/Parker

loan. Now, the only "evidence" that Plaintiffs submit to support class certification are

depositions taken in *other* legal proceedings to which BANA was not a party (Pls.' Exs. 1-4,

ECF 50-2–50-5); disjointed emails that establish no misconduct by BANA employees (Pls.' Exs.

5-11, ECF 50-6–50-12); and an unauthenticated spreadsheet that appears to have been created by

Plaintiffs' counsel, reportedly sourced from Genuine Title data that itself has not been

authenticated (Pls.' Exs. 14-15, ECF 50-15, 50-16).

Plaintiffs' failure to present this Court with any admissible or reliable evidence makes it

impossible for this Court to conduct the required "rigorous analysis" under Rule 23. Instead, they

impermissibly seek certification based on *mere allegations* rather than a preponderance of the

*evidence*. *Wal-Mart*, 564 U.S. at 351; *Monroe*, 579 F.3d at 384.

### A.     Exhibits 1 through 4: Plaintiffs cannot use the Glickstein and Zukerberg depositions taken in other proceedings.

Plaintiffs have submitted excerpts of deposition transcripts of Zukerberg and Glickstein

taken by the Maryland Attorney General in the Genuine Title enforcement action and in

*Palombaro*. Pls.' Exs. 1–4, ECF 50-2–50-5. But BANA was never a party to either proceeding,

had no notice of the depositions, and was not represented at the depositions. It thus had no

opportunity to object to improper questions or to cross-examine.

Federal Rule of Civil Procedure 32(a)(1)(A) states that a deposition may be used against

a party only if "the party was present or represented at the taking of the deposition or had

reasonable notice of it." Neither condition is satisfied as to BANA. Rule 32(a)(8) also states that

a deposition taken in a different action may only be used "in a later action involving the same

subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action." Because BANA was not a party to the Genuine Title Enforcement action or *Palombaro*, Rule 32(a) precludes use of the depositions here. *See also Murdoch v. Rosenberg & Assocs., LLC*, 2013 WL 1209144, at *8 (D. Md. Mar. 22, 2013).

**B.    Exhibit 5: Zukerberg's *Fangman* Affidavit lacks foundation and does not show BANA was engaged in the Genuine Title scheme.**

Plaintiffs next rely on a May 20, 2016 Zukerberg affidavit that was created for the *Fangman* action. The *Fangman* action asserted claims against Genuine Title and multiple lender defendants but not BANA, which had been dismissed in 2015. The Affidavit does not mention BANA or any BANA employee. It makes generalized assertions about Genuine Title's conduct related to other unidentified "brokers, managers, banks and other lenders" without identifying them or specifying a timeframe. The 2016 Zukerberg affidavit is not relevant here under Rule 401 and lacks probative value under Rule 403 of the Federal Rules of Evidence.

**C.    Exhibits 6 through 11: Plaintiffs rely on unauthenticated emails that does not establish any wrongdoing by BANA employees.**

Plaintiffs' Exhibits 6–11 are essentially the same cryptic emails that were exhibits to the Amended Complaint. They are not authenticated by any witness having personal knowledge about them under FRE 602 and 901. They are inadmissible hearsay under FRE 802. On their face, they relate to *other mortgage lenders*, not to BANA.[6] While the email labeled Exhibit 10 appears to be an internal Genuine Title communication referring to three BANA loans, it is untethered to any other evidence that would show its relevance to the Dobbins/Parker loan or

---

[6] Exhibits 6 to 11 bear no identifying production stamp. *See* Ex. 6 (email with First Mortgage Corporation consultant about "dead loans"); Ex. 7 (email referencing @americanfsb.com); Ex. 8 (email with ENMC Direct representative regarding his closed loans); Ex. 9 (email with First Mortgage Corporation branch manager with subject "wells to wells"); Ex. 10 (unauthenticated email exchange between two Genuine Title employees regarding loans without context); Ex. 11 (unauthenticated email exchange regarding loans without context).

how it is probative under FRE 401. And the emails are limited to a seven-month period from late 2010 to early 2011. Exhibits 6 to 11 are thus unauthenticated by testimony and not relevant to BANA. The Court should exclude these emails under Rules 602, 802, 901, 401 and 403.

**D.      Plaintiffs' unauthenticated Exhibit 14 is improper.**

Exhibit 14 to Plaintiffs' Motion is labeled "The Bank of America Class Loans Spreadsheet," but it is not based on BANA's data. It purports to contain information derived from Genuine Title's TitleExpress software to identify BANA loans closed by Genuine Title. *See* Pls.' Mem. 13, ECF 50-1. Although Plaintiffs' counsel asserts that this spreadsheet "identifies each individual who is a borrower on a Bank of America Class Loan . . ." that was referred to Genuine Title, *id.*, neither the spreadsheet nor its underlying data have been authenticated by any custodian of records or other witness with personal knowledge sufficient to verify them. Instead, Exhibit 14 appears to be work product created by Plaintiffs' counsel, and is unsupported by any evidence that would validate its data, prove its reliability, describe how it was created, or explain its meaning, the source of the fields and its contents.

Exhibit 14 contains at least 44 "loans" that are "bad" data, including loans that closed through another settlement provider and loans originated by PHH Mortgage Corporation rather than a BANA MLO. Strum Decl. ¶ 16.[7] It also contains fields of information that do not match BANA's data. For instance, Exhibit 14 contains a field called "Client Contact," but the underlying Genuine Title data on which Exhibit 14 is based contained over 60 loans with contact names that do not exist in BANA's employee records, and only about 25% of the "Client Contacts" were Mortgage Loan Officers. *Id.* ¶ 7. Yet during the six months set aside for class

---

[7] There are actually 48 loans that are not validated by BANA's data rather than 44, because BANA has now identified four additional entries that appeared to be BANA loans but, on further review, had only unsigned HUD-1's and did not actually result in a note, mortgage or deed of trust associated with them. Strum Decl. ¶14.

certification discovery, Plaintiffs never sought production of BANA's own loan data – they only sought information about the names associated with the loans in Genuine Title's data.

Rule 901 requires the proponent of evidence to authenticate that item of evidence by producing "evidence sufficient to support a finding that the matter in question is what its proponent claims." *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 542 (D. Md. 2007). In their preface to Exhibit 14, counsel concede that they have unilaterally determined what is "most relevant" and what is "not material." While counsel make certain representations about their spreadsheet, counsel cannot authenticate the underlying data. And no effort has been made to authenticate the Exhibit 14 spreadsheet under Rule 901 through sworn testimony from any Genuine Title personnel, to otherwise lay a foundation for its admissibility, or to verify the underlying data. In short, counsel are attempting to vouch for and subjectively interpret selected data they harvested from Genuine Title. Ultimately, Plaintiffs—despite the six-month period for class discovery—have not laid an evidentiary foundation for Exhibit 14 and cannot show it is reliable. This Court cannot certify a class based on unverified, unreliable and inadmissible data.

### E.      Plaintiffs lack knowledge sufficient to prove their own claim.

The deposition testimony by Dobbins and Parker shows their knowledge about and participation in their own case is so minimal that they have essentially abdicated to their attorneys the role of class representatives. Dobbins was asked repeatedly to state the basis for her contentions against BANA. Each time, Plaintiffs' counsel instructed Dobbins not to answer because Dobbins' knowledge is based solely on information supplied by her counsel. *See* Dobbins Dep. 81:8–81:25 (objection to basis for an alleged overcharge), 85:9–87:3 (objection to definition of a turndown opportunity). Parker lacks any knowledge about the BANA loan, Bendebba, or the nature of her claim against BANA. Parker Dep. 11:25–19:24. Parker has never read the allegations in the Complaint or Amended Complaint. *Id.* 27:17–20, 29:6–30:11. Her

18

understanding was limited to what counsel had told her. *Id.* 26:21-27:13, 27:21-28:17. Asked about Michael Bendebba, she testified "I don't know who that is." *Id.* 20:22–24. Plaintiffs' objections and non-responses are inadequate in view of the role a class representative must serve at trial—to prove the claims of the absent class members. Dobbins' and Parker's complete lack of knowledge about their own loan and claim makes them inadequate class representatives and should bar class certification under Rule 23(a)(3) and (4).

## II.    PLAINTIFFS INDIVIDUALLY LACK ARTICLE III STANDING, AND THEREFORE CANNOT REPRESENT A CLASS.

### A.    Dobbins and Parker lack Article III standing.

Article III standing requires Dobbins and Parker to establish (1) that they suffered an injury-in-fact that is concrete and particularized, which (2) must be causally connected to the defendant's conduct, and (3) that will likely be redressed if Plaintiffs prevail. *See Thole v. U.S. Bank, N.A.*, 2020 WL 2814294, at *2 (U.S. June 1, 2020); *Spokeo Inc. v. Robinson*, 136 S. Ct. 1540, 1547 (2016).

But Parker and Dobbins cannot show any injury that would confer Article III standing. Their single-count Amended Complaint asserts: "As a result of the Kickback Scheme, Plaintiffs and class members were deprived of kick-back free settlement services and impartial and fair competition . . . and *as a result* paid higher settlement charges." Am. Compl. ¶ 64 (emphasis added). But Plaintiffs' classwide standing theory, based on a hypothetical reduced-competition overcharge, fails for several reasons. First, *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244 (4th Cir. 2020), rejected the idea that RESPA claims can be based on a theory that a plaintiff was deprived of "impartial and fair competition" *id.* at 256. And there is no proof that BANA participated in the Genuine Title "Kickback Scheme" as described in the Amended Complaint or as shown in *Edmondson v. Eagle National* and *James v. Acre Mortgage*, and assertions about

19

what other lenders may have done prove nothing about BANA. Second, based on Dobbins' own testimony and by the 2020 Zukerberg Declaration, Plaintiffs cannot show they were overcharged for settlement services. Plaintiffs thus cannot carry their burden to show Article III standing.

### 1. Alleged deprivation of "impartial and fair competition" does not confer Article III standing sufficient for a RESPA claim.

In *Baehr*, a RESPA case, the Fourth Circuit held that Article III standing does not exist without a showing of a concrete, quantifiable injury separate from the alleged statutory violation. *Baehr* specifically rejected the "impartial and fair competition" theory Plaintiffs advance here.

In *Baehr*, two Howard County homeowners filed a single-count RESPA class action against their real estate agent and title company. They alleged a kickback scheme in which the title company paid their agent for referrals, which they said deprived them and the class of "impartial and fair competition between settlement service[s] providers." *Baehr*, 953 F.3d at 247. The *Baehr* plaintiffs were not first-time homebuyers and understood that they were free to select their own settlement services provider. Yet the Baehrs closed without asking about Lakeview's rates, the quality of its services, or the affiliation between the agent and Lakeview. *Id*. at 248. They were pleased with the transaction and settlement services they received. *Id*. at 249.

As here, after receiving a solicitation letter from an attorney, the Baehrs filed a RESPA class action alleging that they had been deprived of "impartial and fair competition" between settlement service providers. At summary judgment, Judge Bennett held that the Baehrs lacked Article III standing. The Fourth Circuit affirmed. It held that "the deprivation of impartial and fair competition between settlement services providers—untethered from any evidence that the deprivation thereof increased settlement costs—is not a concrete injury under RESPA." *Id*. at 254 (citations omitted). It remanded with directions to dismiss the case based on the Baehrs' failure to establish standing. *Id*. at 258.

In this case, BANA asserted that Dobbins and Parker lacked standing in its Answer and Affirmative Defenses. ECF 39, p. 35. It then served discovery seeking the basis for their claimed standing. In their responses, Plaintiffs asserted that they were not required to show an overcharge, and said whether Plaintiffs could identify any overcharge was "irrelevant." Pls.' Ans. to Interr. 16. They referred only to the 2016 Zukerberg affidavit created for the *Fangman* case. But *Baehr* holds that Plaintiffs' inability to identify a "concrete and particularized" injury is decidedly relevant, and means they lack RESPA standing.

Like the Baehrs, Dobbins was free to comparison shop for a title/closing provider, but explicitly chose *not* to do so when she executed the Bank's NTART form. She indicated that she preferred to have BANA select the title and settlement provider. *See* Ex. 13 (NTART Form); Dobbins Dep. 61:25–63:10 (confirming NTART form's two options—to choose her own title company, or to have the lender chose the title company—and she elected for the lender to make the selection). Dobbins made no effort to research Genuine Title. Dobbins Dep. 84:14–85:8. She asked no questions about the settlement services charges. She did not compare the fees for title and settlement services identified on her or HUD-1 before closing, or compare them with fees for her prior loans. *Id.* 66:11–68:4. Like the Baehrs, she was satisfied with the settlement services she received, and acknowledged that Genuine Title was entitled to compensation for its services. *Id.* 84:8–13. And, as in *Baehr*, there is no evidence here that Genuine Title's services were inadequate or that its fees were unreasonable.

Then, over five years later, the law firm that now represents Plaintiffs sent them a letter suggesting they might have a claim arising from Genuine Title's business practices. *See* Pls.' Ans. to Interr. 15; June 28, 2016 letter attached as Exhibit 14. This class action followed.

The facts developed in this case during class certification discovery parallel precisely the facts in *Baehr*. Under *Baehr*, Plaintiffs cannot establish an injury-in-fact based on deprivation of "impartial and fair" competition.

### 2. Plaintiffs have produced no evidence that they were overcharged and cannot show a "concrete, quantifiable" injury in fact.

Bare overcharge allegations—unsupported by any evidence developed during class certification discovery—do not confer standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (standing requirements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case") (citation omitted). Yet Dobbins and Parker offer no evidence that they were overcharged for any of the settlement services Genuine Title provided for their refinance. Nor is there evidence of any uniform or systematic overcharge across the entire putative class.

In its Answer and Affirmative Defenses, BANA specifically pled that Plaintiffs lacked standing, paid fair market value for Genuine Title's settlement services, and "had not sustained any cognizable injury-in-fact." ECF 39 p. 35, ¶ 2. Then BANA tried to ascertain whether Plaintiffs had any evidence of an overcharge. But Plaintiffs' counsel—incorrectly—objected that they were not required to show any economic damages. Pls.' Ans. To Interrs. 15, 16 ("Whether there has been any 'overcharge', or Plaintiffs can identify an 'overcharge', is irrelevant."). But Plaintiffs' contention was rejected by the Fourth Circuit in *Baehr*.

Then, at her deposition, Dobbins was asked to explain the basis for her allegation of overcharge in the Amended Complaint. Plaintiffs' counsel instructed her not to answer:

> Q: You mention that, you assert in your case that you paid higher fees with respect to your closing because of the conduct that you are discussing in the complaint.  Can you explain what your basis is for thinking that the fees were higher than they would have otherwise been?

22

MS. ENGLISH: I'm going to instruct you that if your only basis for this information is communications that we've had with your attorneys, then I'm going to instruct you not to answer on the basis of attorney-client privilege. But if you have independent basis, you can answer the question.

A:  I would like to answer that based on attorney-client privilege.

*See* Dobbins Dep. 81:4–81:25. Thus, Dobbins herself has no evidence of overcharge, and her counsel have not come forward with any evidence of overcharge. Instead, they wrongly argued that evidence of overcharge is not necessary to establish standing and thwarted BANA's inquiries about overcharge. Dobbins (and with her, the putative class) instead relies solely on a claim for statutory damages under 12 U.S.C. § 2607(d)(1). Pls.' Ans. To Interrs. 15, 16. But *Baehr* rejected that contention. To establish RESPA standing, *Baehr* held, a plaintiff must show an overcharge. 953 F.3d at 256. And the very recent decision in *Walls v. Sierra Pacific Mortgage Co.*, 2020 WL 1528626, No. GLR-19-00595 (D. Md. March 31, 2020), explained that RESPA requires a plaintiff claiming overcharge to prove that payment did not "bear[] a reasonable relationship to the market value" of the services performed. Even a payment tied to a referral would not violate RESPA if it bears a "reasonable relationship" to market value. *Id.* at *6 (citation omitted).

Dobbins has no evidence that the fees she paid for Genuine Title's services were unreasonable or inflated above the market prices for equivalent settlement services. She did not compare its fees with those of other providers and instead, through the NTART form, elected to have BANA identify a settlement service provider. She said she was satisfied with the settlement services and that Genuine Title was entitled to compensation. *See* Dobbins Dep. 84:2–84:13.

To claim they have standing, Plaintiffs point to an excerpt from the 2016 Zukerberg affidavit (recycled from *Fangman*) where Zukerberg stated that "Referring Agreement Costs was paid by the borrowers out of the settlement costs presented on the HUD-1s." *See* Pls.' Ans. to

Interr. 9.[8]  But that affidavit does not mention BANA, was filed in *Fangman* well after BANA was dismissed, and is untethered to the Dobbins/Parker loan. Moreover, it does not state that any Genuine Title fees that BANA borrowers paid were higher than other settlement service providers' fees. To the contrary, Zukerberg has consistently testified that any benefits Genuine Title gave to brokers or loan officers *did not* increase the fees borrowers paid. Instead, they simply reduced Genuine Title's profit margin:

> Q. So if a particular referral source received compensation or more compensation, would that cause the fees paid by the borrowers for that individual's loan to be higher than the fees would be for other loan originators?
>
> A. No. Because we didn't add the fees on to give to the borrowers, it just came out of, you know, out of our profits.
>
> Q. Okay.
>
> A. It caused me to make less.

*See* Jay Zukerberg *Palombaro* Deposition ("Zukerberg Dep.") 26:2–27:2 attached as Exhibit 4.[9]

Now, BANA has submitted a 2020 Declaration of Jay Zukerberg—executed in connection with this Opposition—that establishes conclusively that Genuine Title did not overcharge borrowers or increase its charges for title and settlement services to offset costs of alleged kickbacks. Zukerberg testifies in his 2020 Declaration about the scope of Genuine Title's services. Zukerberg Decl. ¶ 5. Genuine Title's charges were all based on prevailing market rates in the borrower's geographic region and did not depend on whether the referring loan officer was provided some item of value in exchange for the referral. *Id.* ¶¶ 6–11.

---

[8] The Amended Complaint alleges that the Genuine Title scheme included "Turn Down" Opportunities. Plaintiffs cannot assert that a Turn Down Opportunity, which as defined by Plaintiffs cost Genuine Title nothing, could have resulted in an overcharge to borrowers.
[9] BANA objects to the Zukerberg *Palombaro* deposition, Pls.' Ex. 5, under Rule 32(a). If the Court considers it, however, it disproves any overcharge contention.

Zukerberg's Declaration states that Genuine Title charged prevailing market rates for its title and settlement services based on a number of factors, including the geographic location of the subject property, the typical price of services in that geographic location, the size of the loan, and Genuine Title's out-of-pocket expenses. *Id.* ¶13. Genuine Title's charges to borrowers were consistent with competitors' charges for the costs of title and settlement services. Genuine Title did not overcharge borrowers, and never charged borrowers for services not actually rendered by Genuine Title or one of its vendors. *Id.* ¶14.

Most critically, the amount a borrower was charged for title and settlement services did not depend on whether that borrower's mortgage loan officer received compensation or other items of value in exchange for the referral of title and settlements services to Genuine Title. *Id.* ¶15. Zukerberg testifies (consistent with his prior deposition testimony) that the provision of compensation or items of value to referral sources did not result in an "overcharge" to the borrower. If a particular referral source received compensation or items of value in exchange for the referral, that did not cause the title and settlement fees paid by that borrower to be higher than fees charged to other customers. Genuine Title did not "mark up" the fees charged for title and settlement services. *Id.* ¶16. Instead, the expenses reduced Genuine Title's profit margin. *Id.*

Plaintiffs have produced no evidence that they were overcharged for their settlement services, and no evidence of the "concrete and particularized" injury to them that *Spokeo* and *Baehr* require to establish an injury-in-fact. *Spokeo*, 136 S. Ct. at 1549; *Baehr*, 953 F.3d at 252–53. Zukerberg's 2020 Declaration testimony—the only admissible evidence in this case—confirms that Plaintiffs cannot establish Article III standing.

### B.     If Plaintiffs cannot show Article III standing, no class can be certified.

The burden to demonstrate standing is on Plaintiffs. *See Wittman v. Personhuballah*, 136 S. Ct. 1732, 1736 (2016). These constitutional requirements are equally applicable in class

actions. A class representative must have Article III standing for a class action to proceed. *See Baehr*, 953 F.3d at 252; *Krakauer v. Dish Network*, *LLC*, 925 F.3d 643, 652 (4th Cir. 2019) (Article III applicable to class actions). Because Plaintiffs lack Article III standing to pursue their claims, either individually or on behalf of a putative class, this action should be dismissed under Rule 12(b)(1) as *Baehr* was, and no class can be certified.

## III.   PLAINTIFFS FAIL TO SATISFY THE REQUIREMENTS OF RULE 23(a).

### A.      Plaintiffs have failed to show common questions subject to common proof.

Because Rule 23(a)(2) "speaks in terms of common questions, 'what matters to class certification . . . [is] the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *EQT,* 764 F.3d at 360 (quoting *Wal-Mart*, 564 U.S. at 350) (emphasis in original). Thus, all class members' "claims must depend upon a common contention" that, "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is *central to the validity* of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350 (emphasis added).

Because the "[t]he same analytic principles" governing the Rule 23(a) commonality analysis also apply to the "'more demanding'" Rule 23(b)(3) "requirement that questions common to class members predominate over" any questions affecting only individual members, the two mandates can be assessed "in conjunction." *EQT*, 764 F.3d at 365 (citations and quotations omitted).  The upshot of combining these analyses is that "[t]he common questions must be dispositive and overshadow other issues." *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001).

Here, Plaintiffs have from the outset misdescribed this case—including in their class certification brief—as if it involved an comprehensive, multi-pronged kickback scheme that was "common" across their defined class. But there is no evidence that Genuine Title employed such

a scheme with BANA. At the same time, Plaintiffs have relied on an overreaching interpretation of RESPA to assert that they need not show that each class loan was impacted by a kickback, so long as they can allege some "pattern and practice" of referrals. Neither contention holds up under analysis, so Plaintiffs' "common questions" are not common to the class they define.

  **1.**  ***There is no "common evidence" that would prove the RESPA claim of the entire defined class.***

  "A violation of § 8(a) involves three elements: (1) a payment or thing of value; (2) given and received pursuant to an agreement to refer settlement business; and (3) an actual referral" resulting from the "kickback." *Galiano v. Fidelity Nat'l Title Ins. Co.*, 684 F.3d 309, 314 (2012); *Egerer v. Woodland Realty*, 556 F.3d 415, 427 (6th Cir. 2009); *see Boulware v. Crossland Mortg. Corp.*, 291 F.3d 261, 266 (4th Cir. 2002) (comparing § 8(a) and § 8(b)). RESPA therefore requires proof of an "agreement" to make a "referral" of a loan in exchange for a kickback.

  Here, Dobbins and Parker have identified no common issues and no common proof "central to the validity" of their claim that are susceptible to "classwide resolution" across all borrowers on the 572 loans in their proposed class. In fact, their "common questions" do not even seem to relate to this case. For instance, they argue that the common questions arise from "the coordinated conduct that is at the heart of the Kickback Scheme" and argue that the commonality is underscored by the testimony of Glickstein and Zukerberg regarding "the structure of the Kickback Scheme, the per-settlement amounts of kickbacks, the monthly payment of kickbacks," even though none of those issues even arguably relate to the facts of *this* case or Dobbins' and Parker's loan. Pls.' Mem. 21. Plaintiffs have failed to identify common questions that are supported by any facts relevant to *this* case, and certainly they've failed to show that common issues would predominate over individual inquiries. *Wal-Mart*, 564 U.S. at 350.

Plaintiffs cannot point to any overarching agreement applicable to all BANA loans. In fact, the only "evidence" they point to, deposition testimony by Genuine Title's principals from other cases, shows that large banks like BANA did *not* make comprehensive agreements with Genuine Title. In his CFPB deposition, Glickstein said that only four large banks—Chase, PNC, Wells Fargo and Citibank—received improper benefits from Genuine Title. *See* Brandon Glickstein *CFPB* Deposition ("Glickstein *CFPB* Dep."), attached as Exhibit 5, 118:12–120:14. For the larger banks like Citi, Chase and PNC, Glickstein had a personal relationship with only a particular loan officer. *Id*. 201:11-204:20. BANA was not even mentioned in that testimony. In his subsequent *Palombaro* deposition, Glickstein was asked whether there were leads provided to any BANA employee other than Bendebba. He said he targeted only one other BANA loan officer, whose name he couldn't recall, and "I don't think the relationship materialized." There were no resulting referrals. Asked whether he targeted any others at BANA, he stated, "other than that, no." *See* Brandon Glickstein *Palombaro* Deposition ("Glickstein *Palombaro* Dep."), attached as Exhibit 6, 99:8–17.

There is simply no evidence supporting the assertion that *all* BANA loans for which Genuine Title provided settlement services resulted from a RESPA-violating referral or other kickback, and there is no evidence "common" to the expansive defined class and class period.

Lacking proof of any overarching agreement, Plaintiffs still ask the Court to simply *assume* that *every* loan that BANA made over the six-year period when Genuine Title provided settlement services *must have* violated RESPA.[10] Pls.' Mem. 16–17; 18–19. But there is no evidence of any RESPA-violating "agreement" of that scope, applying to all of the 52 BANA

---

[10] Plaintiffs say there are 620 such "Confirmed and Unconfirmed Class Loans" that "mark the outer boundaries" of the "possible members" of the class. Pls.' Mem. 12. This ill-defined class, which concededly may contain members with no standing, fails to satisfy Rule 23.

MLOs in 15 states who originated loans. Plaintiffs point only to Bendebba, but rely on inadmissible assertions that Genuine Title provided Bendebba (who left BANA in September 2011) with leads on an unspecified date. Pls.' Mem. 13–14 (quoting Glickstein *Palombaro* Dep. 97:10–99:2). Even if that testimony was not inadmissible under Rule 32(a), it related only to Bendebba and the short time he worked as a BANA MLO in 2010–11.

Moreover, Plaintiffs cannot even show that all loans Bendebba originated were referred by Genuine Title or were part of a referral scheme. *See, e.g.*, *Galiano*, 684 F.3d at 314–15 (affirming dismissal of RESPA kickback claims where complaint failed to allege any specifics concerning the referral between named plaintiffs and defendants, because allegations that rely on a "supposed industry-wide practice of kickbacks" were improperly conjectural). To the contrary, BANA has introduced evidence showing that many loans in the putative class could not have been referred to Genuine Title as a result of any "leads" it provided, including loans Bendebba originated. As shown by the Mays Declaration, Bendebba closed certain loans that resulted from marketing sent in his name by BANA's Enterprise Marketing group based on BANA's own queries and analytics of its own customer base. He also closed loans that resulted from specific offers the borrower got from Enterprise Marketing. Mays Decl. ¶¶ 17-18.  As a retail MLO, Bendebba could close loans for customers who merely walked into the branch off the street and inquired about a refinance. Therefore, even as to Bendebba, each loan must be analyzed to determine how the borrower came to Bendebba.

And Plaintiffs have no proof suggesting that any other MLOs got "leads" from Genuine Title or that there was any "common" agreement implicating other MLOs or entire branches. Indeed, Glickstein testified exactly *the opposite*, and said no other BANA MLOs made improper referrals. Glickstein *Palombaro* Dep. 99:3–17. That is consistent with his CFPB testimony that there was no overarching agreement with the large banks, just a personal relationship with one or

29

two loan officers.  Glickstein *CFPB* Dep. 201:11-204:20. To certify "a class in the face of such

uncertainty" and without proof of an overarching RESPA-violating agreement by all 52 of the

originating BANA loan officers across all the loans in the defined class would run "afoul of the

rule that 'actual, not presumed, conformance with Rule 23(a) [is] . . . indispensable.'" *EQT*, 764

F.3d at 361–62 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).

      This case presents very different facts from those in *Acre*, *Edmondson*, and *Fangman*,

where there was some evidence of pervasive kickback schemes with branch managers

implicating entire branches. Plaintiffs have failed to show that common evidence could yield

common answers about an "agreement" binding on all 52 loan officers in 15 states who

originated the loans encompassed in their class definition for the duration of the class period.

### 2. *Plaintiffs misconstrue RESPA and cannot prove RESPA claims for the entire class through a "pattern and practice" theory.*

      In contending that a class should be certified, Plaintiffs theorize that they do not need to

prove a specific kickback or referral for any individual class member—even Dobbins/Parker—

because evidence of a "payment" (presumably here, a lead list) is "circumstantial evidence that a

thing of value was paid to Bank of America … in furtherance of the scheme." Pls.' Mem. 28–29.

To support this broad-brush theory of circumstantial proof of a RESPA violation, Plaintiffs rely

on a regulation implementing RESPA, 12 C.F.R. § 1024.14(e), and a Supreme Court case on

§ 8(a)'s companion provision, § 8(b). Pls.' Mem. 23, 26–29. Plaintiffs also rely heavily on cases

involving different lenders targeted through different means by Genuine Title—*Fangman* and

*Palombaro*—to argue that their deficient evidentiary submissions is sufficient to justify class

certification. But those holdings on different facts involving other lenders cannot be extrapolated

to BANA. And Plaintiffs improperly attempt to stretch 12 C.F.R. § 1024.14(e) far beyond its text

and the case law that applies it.

### a.  12 C.F.R. § 1024.14(e) does not support Plaintiffs' argument.

Plaintiffs pin their certification argument to 12 C.F.R. § 1024.14(e), which provides

> An agreement or understanding for the referral of business incident to or part of a settlement service need not be written or verbalized but may be established by a practice, pattern or course of conduct. When a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business.

Simply put, § 1024.14(e) is a mechanism by which a litigant can show the existence of an *agreement* through circumstantial evidence where no explicit evidence of that *agreement* exists. *Spears v. First Am. eAppraiseIT*, 2014 WL 4647679, at *9 (N.D. Cal. Sept. 16, 2014).

However, 12 C.F.R. § 1024.14(e) pertains solely to the "agreement" element of a RESPA Section 8(a) claim, and does not absolve a plaintiff of responsibility to prove the remaining elements of Section 8(a). *Schuetz v. Banc One Mort. Corp.*, 292 F.3d 1004, 1013 (9th Cir. 2002) (holding that 12 C.F.R. § 1024.14(e) does nothing more than "describe[] how an 'agreement or understanding' for referral of business can be proved;" it does *not* "adopt[] a different test for proving liability.") (affirming denial of class certification).

Moreover, the regulation says nothing about what transactions an agreement, if proven, might cover.[11] In essence, Plaintiffs take the position that because 12 C.F.R. § 1024.14(e) allows an inference that a *single* MLO made an unwritten, unverbalized referral agreement, the Court may further infer that *51 other* loan officers simultaneously made equivalent agreements encompassing the entire class period. Yet Plaintiffs point to no authority interpreting 12 C.F.R.

---

[11] This regulation actually adds little to the text of § 8(a)'s, which by its terms provides that an "agreement" may be merely "oral" or proven "otherwise." 12 U.S.C. § 2607(a). Both the statute and regulation simply clarify that a plaintiff may show that an agreement existed through circumstantial evidence. The provisions does not, however, mean that an agreement with one "person" can excuse proof of other agreements with other "persons" under § 2607.

§ 1024.14(e) to allow this attenuated inference when only one individual—Michael Bendebba—

is even mentioned in the Complaint and certification argument.

Plaintiffs proffer a brief mention of Bendebba in a few pages from an inadmissible

deposition to suggest that *one* MLO had accepted leads from Genuine Title and *agreed* to make

referrals in return. Whatever agreement that might prove, it does not prove any of the other 51

independent MLOs—scattered over 15 states—made any agreement with Genuine Title. It

certainly does not prove that the actual Defendant here, BANA, made any agreement at all. And

it does not prove the additional required elements of § 8(a), *i.e.*, that every loan in the putative

class was referred to Genuine Title in return for a lead that Genuine Title provided.

Neither the Fourth Circuit nor any other court has held that 12 C.F.R. § 1024.14(e)

permits admission of evidence of Genuine Title's "practice" of forming cash kickback

agreements with other, small lenders and their branch managers to prove an omnibus agreement

by BANA. The regulation does not authorize a presumption that one lender's agreement is

predictive that another, differently organized lender made an identical agreement. And after

months of class certification discovery, there is no evidence of such an agreement.

> **b.   Plaintiffs misconstrue *Freeman v. Quicken Loans*.**

Plaintiffs also misread the Supreme Court's ruling on the elements of § 8(b) in *Freeman*

*v. Quicken Loans*, 566 U.S. 624 (2012). Pls.' Mem. 26, 28–29. Contrary to Plaintiffs' argument,

*Freeman* nowhere "'indicated that payment of a thing of value [under § 8(a)] need not be tied in

any respect *to a particular borrower*.'" *See* Pls.' Mem. 26 (emphasis added) (quoting *Fangman v*

*Genuine Title LLC*, 2016 WL 6600509, at *12 (D. Md. Nov. 8, 2016)); *see also id.* at 28–29

(citing *Freeman*). Instead, *Freeman* made a very different point: that § 8(a) and § 8(b) impose

different requirements regarding the source of the payment from the service provider to its

recipient. While § 8(b) requires a plaintiff to show that a provider transferred some portion of the

actual *"charge"* paid to it by the borrower, § 8(a)'s text does not require the provider's payment to come from a particular source. *Freeman*, 566 U.S. at 636 (emphasis added) (quoting § 8(b)). Instead, § 8(a) "applies to the transfer *of any* 'thing of value'" by the service provider to the referring party, whether the provider funds the transfer from the borrower "charge" or from some other source. *Id.* (emphasis added) (quoting § 8(a), (b)).[12] *Freeman* did not dispense with § 8(a)'s requirement that the transfer of value arise from an "agreement" to refer "business incident to or part of a real estate settlement service involving *a* federally related mortgage *loan*," *i.e.,* involving a particular mortgage *loan* and particular *borrower*. *Id.* (quoting § 8(a)) (emphasis added).

### c.   The *Fangman* and *Palombaro* classes were certified based on their different facts.

The *Fangman* and *Palombaro* class certification rulings, like this Court's in *Edmondson* and *James,* were rooted in the very different facts of those cases, which are unlike this one. The most important difference is that in each of those cases there was substantial testimony that *branch managers* at *multiple branches* of the defendant lenders had participated pervasively in Genuine Title cash kickbacks and sham marketing agreements. Evidence of illicit participation by managers—who by definition control whether and to whom subordinates may refer borrowers for settlement services—across multiple branches of a lender are what create the possibility of a single, common claim that is absent here. Proof of a kickback scheme involving a branch manager who controlled referrals might enable borrowers of that branch to prove that they were

---

[12] *Freeman* further explains that § 8(a) is "narrower" than § 8(b) in other senses, in particular § 8(a)'s requirement that plaintiff prove the existence of an "'agreement'" to make a "'referral'" in exchange for the kickback. *Freeman*, 566 U.S. at 636 (quoting § 8(a)). The Court's example of a "retainer" agreement where a provider pays a monthly sum in exchange for the recipient's agreement to refer "any business" to the provider further underscores the need for proof of both the making of the "agreement" and what "business" is within its scope.

*all referred pursuant to the same agreement* to make compensated referrals "in one stroke." *Wal-Mart*, 564 U.S. at 350. But here there is no evidence of misconduct involving either any BANA managers or an entire branch. Glickstein's *Palombaro* testimony makes clear there *was* no "common scheme" direct to BANA.

In *Fangman*, there was evidence of compensated referrals to Genuine Title from multiple branch managers from different branches and, within each branch, multiple MLOs that were receiving *quid pro quo* for those referrals. *Fangman*, 2016 WL 6600509, at *3. In *Palombaro*, the evidence indicated that three bank branch managers—each managing teams of loan officers within their branches—received kickbacks through sham companies that they created to receive unlawful monetary payments. *See* 2017 WL 3437559, at *9–10 (S.D. Ohio Aug. 10, 2017). Similar evidence was proffered in *Edmondson* and *James.* Plaintiffs here have provided no such evidence. Success on different facts in *Fangman* and *Palombaro* does not bolster the Plaintiffs' sparse factual showing here, which does not implicate any BANA manager and refutes any contention of an overarching classwide scheme.

### B.  Plaintiffs have not demonstrated adequacy or typicality.

Dobbins and Parker also fail to satisfy the typicality requirement of Rule 23(a)(3) or the adequacy requirement of Rule 23(a)(4). "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)). The typicality and adequacy requirements "tend to merge." *Falcon,* 457 U.S. at 157–158, 157 n. 13.

As described above, Dobbins and Parker have several characteristics that render them atypical and therefore inadequate class representatives. First, Plaintiffs lack Article III standing. Second, Plaintiffs can only speculate—without substantiating evidence—that their loan *may*

have been included in a lead list provided to Bendebba. *See* Pls.' Ans. to Interr. 6 ("I do not know whether my information appeared in any of the data and lead lists that Mr. Bendebba, or other Bank of America employee, received as a kickback from Genuine Title, but it seems likely that I was because I received a Bank of America direct mailer."). Although the class supposedly includes loans involving cash referral payments, the provision of marketing credits, or a turndown opportunity, Dobbins cannot show that her loan was the subject of any of these.  Third, Plaintiff and her counsel have made no attempt to conduct discovery to show that any other class member's loan was affected by any such referral. Plaintiffs' lack of effort to do so calls into doubt their typicality and adequacy to represent a class.

Rule 23(a)(3) limits class claims to those fairly encompassed by the class representatives' claim. As the Fourth Circuit's leading typicality precedent holds, "the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998) (citation omitted). But here, each class member's claim will need to be analyzed and proven on a variety of issues. Even if Dobbins and Parker could prove they have standing and can prove their own claim, it will do *nothing* to prove the claims of the putative class members, who had different MLOs at different times, different reasons for using that MLO, different loan circumstances, and different closing fees in different geographic locations. Those class members' claims will not be and cannot be proven through Plaintiffs' claim. Indeed, even proving that any loan officer other than Bendebba agreed to make paid referrals of customers "would require new and different proof." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 468 (4th Cir. 2006). These differences in proof preclude Plaintiffs' typicality argument. *See Ealy v. Pinkerton Gov't Servs.*, 514 F. App'x 299, 306–08 (4th Cir. 2013) (reversing certification where court "did not compare the claims of the Appellees with the class as a whole").

35

IV.   **NO CLASS CAN BE CERTIFIED UNDER RULE 23(b) BECAUSE INDIVIDUAL ISSUES AND DEFENSES WILL PREDOMINATE.**

As *EQT* held: "The predominance inquiry focuses not only on the existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation." It asks whether there are "legal and factual questions that qualify each class member's case as a genuine controversy." 764 F.3d at 366 (quoting *Amchem*, 521 U.S. at 623). And *EQT* held that "[e]ven a plethora of identical practices will not satisfy the predominance requirement if the defendants' common conduct has little bearing on the central issue in the litigation . . . ." *Id.*

Individual questions predominate and will subsume any common questions that could exist here. First, each class member's individual loan will need to be analyzed to determine whether there was an overcharge, which is necessary to establish RESPA standing. Second, even if the class member has standing, a host of other individual questions will need to be asked and answered about the details of each individual loan, especially in light of the fact that there was no single course of conduct or scheme common to all BANA MLOs. Third, individual questions will arise about the equitable tolling of each class member's otherwise time-barred claims. The Fourth Circuit's *Edmonson* decision held that Plaintiffs' contentions of fraudulent concealment and due diligence raise factual questions that are generally "unsuited for summary judgment." 922 F.3d at 554. If unsuited for summary judgment, these factual questions are likewise unsuited for classwide proof, meaning that individual inquiries would be necessary to determine whether and for how long the statute of limitations was tolled for each class member.

Plaintiffs have failed to carry their burden under *Comcast* to come forward with "evidentiary proof" that satisfies these aspects of Rule 23(b).  Instead, the evidence shows that individual issues would predominate and make a class action unmanageable.

A.   **Determining whether any particular class member has Article III standing would require individualized inquiries.**

36

Because Dobbins and Parker themselves lack standing, they cannot represent any class and are inadequate class representatives. Moreover, even assuming that *some* putative class members *might* have standing, determining whether each individual class member/borrower had standing would require an individualized inquiry.

There is no evidence of any uniform or systematic overcharge tied to a RESPA-violating agreement *by BANA*. To determine whether any individual putative class member's settlement service fees contained an "overcharge" sufficient to confer standing under *Baehr* would require the kind of "complicated and individualized process" that *EQT* rejected. This defeats predominance. And even if it is assumed that some individual class members *might* be able to show an overcharge, that would mean "[s]ome of the members likely have standing, and some likely do not." *See Halvorson v. Auto Owners Ins. Co.*, 718 F.3d 773, 779–80 (8th Cir. 2013) (individual questions of whether the putative class member suffered an injury-in-fact predominated over common questions of law and fact).

Here, there is no *classwide* method to determine whether each putative class member might have been overcharged. Again, the fee must bear no "reasonable relationship" to market value of the service provided to constitute an overcharge under *Walls v. Sierra Pacific Mortgage Co.*, 2020 WL 1528626 at *6. Every one of the 572 putative class loans would require an analysis of the prevailing fee range *in the applicable geographic market for settlement services at the time the loan was closed*, and whether the fees charged were comparatively "reasonable." Plaintiffs did not commission an expert to attempt such an analysis, and have shown no methodology by which such an overcharge analysis could be conducted as to each class member, much less on a classwide basis. And that complicated analysis would still not consider the key question of whether the originating MLO received any RESPA-violating "kickback" tied to the overcharge on the class member's and referred the loan pursuant to an "agreement."

Plaintiffs have failed to come forward with any evidence that BANA borrowers were uniformly or systematically overcharged for settlement services, and they have proposed no methodology to determine each borrower/putative class member has a "concrete and particularized" injury that would confer Article III standing. Without such evidence and methodology, the Court must decline to certify the proposed class. *See Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1276 (11th Cir. 2019) ("[A] class should not be certified if it is apparent that it contains *a great many* persons who have suffered no injury at the hands of the defendant."). If many class members have *no* claim, the divided class does not satisfy Rule 23(b)(3). *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 824 (7th Cir. 2012) ("If . . . a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification.") (citations and quotations omitted).

**B.      Individual inquiries regarding each class member's claim and BANA's defenses to each claim will predominate.**

Even if Plaintiffs could establish standing for the entire class, the remaining individual questions relating to each class member's circumstances will predominate and subsume any common questions identified by Plaintiffs. Rule 23(b)(3) requires that questions "common to class members predominate over any questions affecting only individual members." *Wal-Mart*, 564 U.S. at 362. "The common questions must be dispositive and overshadow other issues." *Lienhart*, 255 F.3d at 146.  If not, class certification is inappropriate.  *Wal-Mart*, 564 U.S. at 350.

Here, individualized issues will predominate over the common questions identified by Plaintiffs. Each putative class member/borrower's particular loan, and the circumstances under which it was originated and closed, will need to be explored and proven to assess whether there

was an agreement that related to that borrower, whether there was a referral from Genuine Title, and whether there was a "payment" or kickback giving rise to a violation.

Despite Plaintiffs' argument that common questions exist based on a "single course of conduct" and "common scheme," assertions repeated from briefs in other cases are empty here and are disproven by BANA's evidence about BANA's own loans.[13] Plaintiffs have not shown that there was an overarching, class-inclusive, Genuine Title scheme related to BANA's loans. No two loans were alike, and the circumstances of each loan will need to be analyzed.

Most notably, the 572 BANA loans for which Genuine Title provided settlement services were closed by 52 different MLOs in 15 states. Strum Decl. ¶ 17. Plaintiffs have no evidence of a common thread that connected them to each other or to any broad BANA-Genuine Title "agreement." For example, 39 of those MLOs closed only one loan each, *id.* ¶ 18, which casts doubt on Plaintiffs' attempt to include those loans in the putative class. In addition, not all the loans were originated by retail MLOs like Bendebba. Some were originated by Centralized Sales MLOs who did not solicit business but originated loans resulting from inbound phone calls from consumers. Mays Decl. ¶ 8. Other loans began with inbound calls to Centralized Sales but were referred out to Retail MLOs through an overflow system. *Id.* ¶¶ 4–6. Still others resulted from direct marketing campaigns by BANA's "Enterprise Marketing" department to existing mortgage customers based on queries of BANA data. *Id.* Still other loans were to borrowers who put themselves on a reservation list to be contacted regarding the HARP program. *Id.* ¶ 26. There is no evidence that these loans resulted from any "scheme" or any MLO's "agreement." So the circumstances of each loan would need to be explored to determine if Plaintiffs had any evidence that the loan resulted from "an agreement" between the originating MLO and Genuine Title.

---

[13] This evidence from BANA differentiates this case from *James, Edmondson,* and *Fangman,* where there was evidence of schemes involving branch managers and pervasive wrongdoing.

And Bendebba, who only originated loans between August 2010 and September 2011, closed at least eleven loans that resulted from specific BANA marketing campaigns sent by the Enterprise Marketing group. These campaigns were based on BANA's harvesting of leads from its own data. *Id.* ¶ 18. Moreover, the evidence shows that some BANA borrowers could have walked into Bendebba's branch because of Enterprise Marketing campaigns, especially FHA and VA borrowers who regularly got refinance solicitations. *Id.* ¶¶ 9, 21. There is no basis to assume all Bendebba-originated loans were based on leads from Genuine Title, so each loan would need to be examined to determine how the loan came to Bendebba.

Plaintiffs also fail to describe or propose a classwide method of proving that each of the 52 BANA MLOs actually "referred" each of the borrowers in the putative class to Genuine Title. RESPA § 8(a); *see Galiano*, 684 F.3d at 314. To prove a "referral," each class member would need to show that BANA either (1) took some "action directed to a person [*i.e.*, the customer] which ha[d] the effect of affirmatively influencing th[at customer's] selection" of Genuine Title for title services; or (2) "required" the customer "to use" Genuine Title.  12 C.F.R. § 1024.14(f). But Plaintiffs' counsel offer only unauthenticated Exhibit 14. They then ask the Court to simply *presume* that the dozens of BANA MLOs improperly "referred" every BANA loan and borrower for settlement services. Pls.' Mem. 13 (spreadsheet means BANA employees "assign[ed] and referr[ed]" each loan to Genuine Title); *see id.* at 21. This presumption is contrary to BANA's records, indicating that some borrowers actually selected Genuine Title themselves, and is unsupported by evidence of agreement with or kickbacks to all 52 MLOs.[14]

---

[14] During this time, BANA required borrowers to complete an NTART form with which they could opt to select their own settlement services provider. This form necessarily prompted individual conversations between borrowers and BANA mortgage processors. Some borrowers' NTART forms indicate that *they* chose Genuine Title.  Strum Decl. ¶ 23. NTART forms for each putative class member would have to be examined, and inquired into individually, to determine why and how Genuine Title was selected as the settlement service provider.

Dobbins herself cannot prove the existence of a referral. There is no evidence that Dobbins' name was on any referral list Genuine Title created, that such a list was sent to Bendebba, or that Dobbins contacted Bendebba as a result of such a list. Rather, the evidence shows Dobbins called BANA herself on July 1, 2010 to inquire about a loan modification. Mays Decl. ¶ 23. Dobbins then began a NACA modification application process in late July 2010, and that BANA was notified of her interest. As an existing BANA FHA borrower, Dobbins would have been notified of her eligibility to refinance in various ways. *Id*. ¶ 6. Even if Dobbins had been on a lead list provided to Bendebba, that would not prove that she was solicited by BANA as a result of that lead rather than due to independent marketing by BANA, nor would it prove that any other class member was "referred" to any other MLO by Genuine Title.

Dobbins' refinance thus was the product of solicitations she received, a flyer she says led her to Bendebba, and various communications she had with BANA and with Bendebba. BANA would be entitled to explore this who, when, how, and why inquiry as to each borrower and loan, in addition to the who, when, how, and why about each MLO and his or her relationship, *if any,* with Genuine Title. Thus individual questions regarding each putative class members' particular circumstances will predominate and overwhelm any potential common questions, including:

- Who was the originating MLO?
- Did any agreement to refer loans for a kickback exist between that MLO and Genuine Title at the time the loan was closed?
- How did the borrower find the MLO?
  - Did the borrower get solicitations from BANA's Enterprise Marketing group?
  - Did the borrower receive a solicitation sent out *not* by the MLO himself, but by the Enterprise Marketing group in the MLO's name, as part of the CCP program?
  - Did the borrower have an existing FHA or VA mortgage with BANA that prompted monthly marketing about refinancing eligibility?
  - Did the borrower put himself on a HARP "reservation list" to be contacted once the HARP program became available?
  - Or was the borrower referred to the MLO on a "lead list" from Genuine Title?
- Did the borrower use the NTART form to select Genuine Title or was it selected for her by the MLO?

41

- Did the fees charged by Genuine Title for its settlement services "bear a reasonable relationship to market value" of the services that were provided?

The individualized inquiries necessary to answer these questions contravene the objectives of class certification and therefore defeat predominance.

### C.    Equitable tolling presents individualized questions.

Following the Fourth Circuit's ruling, this Court must address how to determine whether the claims of absent class members are barred by RESPA's one-year statute of limitations. The putative class purports to include any borrower whose loan closed between 2009 and 2014. Am. Compl. ¶ 84. Because RESPA's statute of limitations is triggered on the date the loan is closed, *Grant v. Shapiro & Burson, LLP*, 871 F. Supp. 2d 462, 470 (D. Md. 2012) (citing 12 U.S.C. § 2614), the statute of limitations is long-expired.

To avoid this bar, Plaintiffs invoke "fraudulent concealment" tolling for themselves and the entire putative class. This requires a showing that: (1) the basis for their RESPA claims was fraudulently concealed by BANA; and (2) each plaintiff failed to discover those facts within the statutory period despite (3) exercising due diligence. *Edmonson*, 922 F.3d at 548. The Fourth Circuit's *Edmonson* decision expressly held that questions over concealment and due diligence require inquiries into each plaintiff's state of mind, and involve specific factual determinations that "*are not amenable to resolution on the pleadings or even at summary judgment.*" *Id.* at 558 (emphasis added). If these issues specific to individual plaintiffs cannot be decided at summary judgment, it logically follows that they cannot be decided on a classwide basis. The three-part fraudulent concealment analysis must be conducted individually.

***BANA's Alleged Concealment***. To show fraudulent concealment, each putative class member must show that "the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim." *Id.* at 548. This requires an affirmative act of

42

concealment such as "'some trick on contrivance intended to exclude suspicion and prevent inquiry.'" *Id.* at 553 (quoting *Carrier Corp. v. Outokumpu Oyj*, 673 F.33d 430, 446-47 (6th Cir. 2012)). The "tricks or contrivances" that the Fourth Circuit cited included "sham" entities to channel kickbacks and the execution of "sham" back-dated Title Services Agreements. But there is no evidence of any such sham entity or agreement connected with BANA. This differentiates BANA from Eagle National Bank or Acre Mortgage, whose practices were being described in *Edmonson*. Nor is there evidence implicating any BANA branch manager.

Plaintiffs are left to rely on their contention that BANA borrowers' GFEs and HUD-1s constituted "fraudulent concealment" because those documents should have somehow disclosed that the borrower was "assigned and referred to Genuine Title under the Kickback Scheme—in each instance Bank of America chose a title company because of, and to continue, illegal kickbacks." Pls.' Mem. 31. But this begs the question. There is no classwide or common proof that BANA referred putative class members' loans to Genuine Title in exchange for kickbacks. The Court cannot examine an individual borrower's HUD-1 and from that examination determine whether that loan was referred to Genuine Title "pursuant to an agreement to refer settlement services." Even if the Court examines each HUD-1 individually for each putative class member, it cannot ascertain from the HUD-1 itself whether or not that loan was referred to Genuine Title because of a kickback. The same goes for each borrower's NTART forms.[15]

***Due Diligence***.  Each putative class member must prove she or he "exercised due diligence to uncover the facts supporting their claims and yet failed to uncover such facts within the limitations period." *Id.* at 554. This requires evidence about when each class member was on inquiry notice of a possible claim and what she or he did to investigate it.  *Id.* at 555–56. As the

---

[15] Nor is it clear what the HUD-1 should have said that it did not, when the supposed "kickback" was a lead list containing the names of existing BANA mortgage customers.

Fourth Circuit acknowledged, the Genuine Title-related enforcement actions were publicized, including articles in *The Baltimore Sun* and *Washington Post. Id*. at 556. A sampling of these reports and news releases is already part of the record here. *See* ECF 17-3, 17-4, 17-6 (Mem. In Supp. of Mot. To Dismiss, Exs. B, C, E); ECF 19-2, 193 (Reply Mem. Exs. G, H).

The Court's *Edmondson* class certification ruling proposes that "this Court can assess, on a classwide basis, whether the information and media reporting" about Genuine Title "would have prompted a reasonable person to uncover the facts substantiating Plaintiffs' RESPA claims." *Edmonson* Op. at 11. This seems to forecast a summary judgment ruling that the reporting was insufficient to put "a reasonable person" with a loan for which Genuine Title provided settlement services on inquiry notice. Perhaps that is so, assuming that the Court can determine what information a hypothetical "reasonable residential mortgage borrower" would have had. Respectfully, that also assumes away the possibility that some borrowers might actually be subscribers to *Sun* or the *Post* and read their articles about Genuine Title. It further assumes away the possibility that they realized their own closing had involved Genuine Title, but decided not to bother making any further inquiry.

Deciding the issue of due diligence through a one-size-fits approach is problematic. *See Broussard*, 155 F.3d at 342 ("[T]olling the statute of limitations on each of plaintiffs' claims depends on individualized showings that are non-typical and unique to each [individual class member]."); *see also Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1263 (4th Cir. 1993) ("The exercise of due diligence is measured by an objective standard . . . and whether due diligence was exercised must be judged solely under the peculiar circumstances of each case.") (internal citations and quotations omitted); *Minter v. Wells Fargo Bank, N.A.*, 2013 WL 1795564, at *3 (D. Md. Apr. 26, 2013) (decertifying a tolling class because "[t]he Court's

concern about manageability revolves around the concealment and due diligence elements of tolling," which requires "individualized inquiry into due diligence").

This also requires the Court to assume that the news consumption habits of Dobbins and Parker are typical of all class members. But their interrogatory responses suggest instead that those habits are highly idiosyncratic. Pls.' Ans. to Interr. 13; Dobbins Dep. 73:2–78:18. Parker paid virtually no attention to any news source. Pls.' Ans. to Interr. 14; Parker Dep. 23:15–26:4. Plaintiffs have made no showing that their individual news access or news consumption habits are typical of the proposed class, or that they can offer "common evidence" that will apply to the proposed class. It seems doubtful that during the relevant time frame every member of the putative class had news sources and consumption habits that track those of Dobbins and Parker. Yet that is the premise on which class certification would rest here.

## V.   THIS PROPOSED CLASS ACTION CANNOT BE SUPERIOR.

The existence of individual issues that would overwhelm a classwide proceeding here also means that this class action cannot be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The lack of proof of any RESPA-violating "agreement" that encompassed all 52 MLOs who originated the loans swept up in the class definition, the similar lack of proof of any improper benefit conveyed to each of those MLOs by Genuine Title in exchange for referrals of business, and most fundamentally the lack of classwide proof of Article III standing create daunting manageability problems. Adjudication of these questions for each loan in the class would be anything but efficient.

### CONCLUSION

Plaintiffs have not met their burden under Rule 23, so class certification should be denied. And because Plaintiffs themselves lack Article III standing, this action should be dismissed under Rule 12(b)(1).

45

Dated:  June 19, 2020                             Respectfully submitted,


                                                          /s/ Craig R. Haughton
                                                 Bradley R. Kutrow (admitted *pro hac vice*)
                                                 McGuireWoods LLP
                                                 201 N. Tryon Street, Suite 3000
                                                 Charlotte, NC  28202
                                                 (704) 343-2049
                                                 (704) 343-2300 (Fax)
                                                 bkutrow@mcguirewoods.com

                                                 Tammy L. Adkins (admitted *pro hac vice*)
                                                 McGuireWoods LLP
                                                 77 W. Wacker Drive, Suite 4100
                                                 Chicago, Illinois 60601-1818
                                                 Telephone:  (312) 849-8100
                                                 Facsimile:   (312) 849-3690
                                                 tadkins@mcguirewoods.com

                                                 Craig R. Haughton (Fed. Bar No. 28585)
                                                 McGuireWoods LLP
                                                 1251 Avenue of the Americas, Floor 20
                                                 New York, NY 10020
                                                 (212) 548-2157
                                                 (212) 548-2150 (Fax)
                                                 chaughton@mcguirewoods.com

                                                 *Counsel for Defendant Bank of America, N.A.*


## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2020, the foregoing Defendant Bank of America, N.A.'s

Opposition to Motion for Class Certification was filed and served via the CM/ECF system.


                                                          /s/ Craig R. Haughton
                                                 Craig R. Haughton